J-S19032-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.R. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.M.M., MOTHER | : | No. 2993 EDA 2018 |

Appeal from the Decree Entered September 17, 2018
in the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2018-A0097

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.J.R. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF K.M.M., MOTHER | : | No. 2997 EDA 2018 |

Appeal from the Decree Entered September 17, 2018
in the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2018-A0095

BEFORE:   LAZARUS, J., KUNSELMAN, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:                **FILED JUNE 11, 2019**

K.M.M. (Mother) appeals from the decrees entered September 17, 2018, which terminated involuntarily her parental rights to her children, T.J.R., a male born in June 2011, and T.R., a female born in January 2013 (collectively, Children).[1]  We affirm.

---

* Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court entered a separate decree confirming the consent of Children's father, T.R. (Father) to relinquish his parental rights, and

The record reveals that Children began living with T.M. (Paternal Grandmother) pursuant to a custody agreement in 2013.[2]  N.T., 9/14/2018, at 18-19.  While the details are not entirely clear from the record, Mother and Father lacked electricity in their home, and later became homeless.  *Id.* at 19.  Mother agreed to grant custody of Children to Paternal Grandmother after the Montgomery County Office of Children and Youth alerted her that it would place Children in foster care if she did not.  *Id.* at 37.  It is undisputed that Mother last had contact with Children in December 2013.  *Id.* at 20.  Since that time, Mother attempted to visit Children on only one occasion by appearing outside Paternal Grandmother's home unannounced.  *Id.* at 47.  However, Paternal Grandmother and Children were not home at the time.  *Id.*  Mother provided no subsequent financial support to Children, nor did she send them cards, letters, or gifts.  *Id.* at 20, 22.  In February 2017, Mother moved to Florida.  *Id.* at 47.

On May 21, 2018, Paternal Grandmother, acting *pro se*, filed a petition to terminate Mother's parental rights to T.J.R. involuntarily and a petition for

_____

terminating his parental rights to Children on the same day.  Father did not file a notice of appeal, nor did he participate in this appeal.

[2] The exact time that Children began residing with Paternal Grandmother was a subject of disagreement during the termination proceedings.  Paternal Grandmother testified that this occurred "earlier in 2013, shortly after [T.R.] was born."  N.T., 9/14/2018, at 18-19.  Mother testified that T.J.R. began to reside with Paternal Grandmother in October 2013 and that T.R. followed suit a month later.  *Id.* at 41.

adoption. She filed a petition to terminate Mother's parental rights to T.R. involuntarily the next day, as well as an additional petition for adoption. The orphans' court conducted a hearing on Paternal Grandmother's petition on September 14, 2018.[3] At the start of the hearing, Mother stated that she would like to relinquish her parental rights to Children voluntarily. N.T., 9/14/2018, at 7. The court then conducted a colloquy with Mother before dictating an order on the record terminating her parental rights. *Id.* at 8-14. However, immediately after the court dictated its order, Mother insisted that she did not want Paternal Grandmother to adopt Children. *Id.* at 15. Accordingly, the court proceeded to conduct the involuntary termination hearing. At the conclusion of the hearing, the court made its findings of fact on the record and announced that it would terminate Mother's rights. The court entered its decrees memorializing this decision on September 17, 2018. Mother timely filed notices of appeal on October 15, 2018, along with concise statements of errors complained of on appeal.

_____

[3] The orphans' court appointed legal counsel to represent Children during the termination proceedings. Counsel stated that she had the opportunity to meet Children. N.T., 9/14/2018, at 5. Moreover, it was undisputed during the hearing that Children did not remember Mother and did not know that she existed. *Id.* at 27-28; *see In re Adoption of C.J.A.*, 204 A.3d 496, at *4 (Pa. Super. 2019) (concluding that the child's legal counsel provided sufficient representation of his legal interests where she explained that the child did not remember his father and believed that his stepfather was his biological parent). We observe with disapproval that Children's counsel failed to file a brief on appeal. *See In re Adoption of T.M.L.M.*, 184 A.3d 585, 590 (Pa. Super. 2018) (explaining that counsel's duty to represent a child continues on appeal). However, we are satisfied that she represented Children's legal interests in the proceeding before the orphans' court sufficiently.

Mother raises the following claims for our review.

[1.] Whether the [orphans'] court erred or abused its discretion in granting [Paternal Grandmother's] petition for involuntary termination of parental rights of [Mother] after determining that [Paternal] Grandmother had established a legal basis for terminating the parental rights of Mother under 23 Pa.C.S.[] § 2511(a)(1) when the order of the [orphans'] court was not supported by competent evidence?

[2.] Whether the [orphans'] court erred or abused its discretion in granting [Paternal Grandmother's] petition for involuntary termination of parental rights of the biological mother [Mother] after determining that [Paternal] Grandmother had established that termination of Mother's rights will not negatively affect the general welfare and needs of the subject minor [Children] under 23 Pa.C.S.[] § 2511(b) when Mother's efforts at bonding were thwarted by [Paternal] Grandmother?

Mother's Brief at 8 (unnecessary capitalization and suggested answers omitted).[4]

We review Mother's claims mindful of the following standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

_____

[4] On January 4, 2019, this Court entered a *per curiam* order remanding this case for the orphans' court to ascertain whether Mother's counsel abandoned her on appeal. We entered this order because Mother's counsel failed to file a brief in compliance with our December 7, 2018 deadline. The orphans' court submitted its response on January 18, 2019, indicating that counsel had not abandoned Mother. On January 22, 2019, this Court entered another *per curiam* order, instructing counsel to file a brief on Mother's behalf by February 5, 2019. Mother's counsel complied with our order by filing a brief on February 5, 2019.

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis.

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b)[.]

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the orphans' court terminated Mother's parental rights pursuant to subsections 2511(a)(1) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

>> \*\*\*

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

- 5 -

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S. § 2511(a)(1), (b).

We consider first whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to subsection 2511(a)(1). To meet the requirements of that subsection, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008). The court must then consider the parent's explanation for his or her abandonment of the child, in addition to any post-abandonment contact. **Id.** We have emphasized that a parent does not perform parental duties by displaying a merely passive interest in the development of a child. **In re B.,N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004) (quoting **In re C.M.S.**, 832 A.2d 457, 462 (Pa. Super. 2003). Rather,

[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in

- 6 -

the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

***Id.*** (citations omitted).

In the instant matter, the orphans' court set forth its findings of fact at the conclusion of the hearing. The court concluded that Paternal Grandmother presented clear and convincing evidence that Mother had refused or failed to perform her parental duties during the six months immediately preceding the filing of the termination petitions in May 2018. N.T., 9/14/2018, at 72-73. The court found that Mother attempted to visit with Children only once after December 2013. ***Id.*** at 72. This attempt occurred in 2014, and Mother made no significant efforts thereafter to visit with Children or develop a relationship with Paternal Grandmother. ***Id.*** Further, Mother did not send Children cards, gifts, or financial support. ***Id.*** at 72-73. The court explained, "I know that [Mother] has testified she wishes to have a relationship with the [C]hildren, but that desire alone, unaccompanied by any affirmative actions on her part taken to create and maintain such a relationship, is insufficient to overcome the history of abandonment in this case." ***Id.*** at 73.

However, Mother contends that Paternal Grandmother failed to meet her burden of proof. Mother's Brief at 16. She asserts that Paternal Grandmother prevented her from maintaining a relationship with Children and denied her requests to see Children as recently as January 2018. ***Id.*** at 16-21. Mother alleges that Paternal Grandmother blocked her phone number and/or obtained

a new phone number and failed to provide it to her. *Id.* at 19-21. She also maintains that she contacted Father every day but that he refused to provide her with contact information for Paternal Grandmother. *Id.* at 16, 19-22. Mother insists that she did not know Paternal Grandmother's street address, which prevented her from sending gifts or correspondence to Children. *Id.* at 20. While she had been to Paternal Grandmother's home in the past, she no longer remembered where it was located. *Id.* Finally, she accuses Paternal Grandmother of lying to Children "as to who their real Mother was." *Id.* at 21.

Upon review, we find the record supports the conclusion of the orphans' court that Mother refused or failed to perform parental duties during the six months immediately preceding the filing of Paternal Grandmother's termination petitions in May 2018. As detailed above, Children began living with Paternal Grandmother in 2013. N.T., 9/14/2018, at 18-19. After December 2013, Mother had no contact with them at all. *Id.* at 20. Mother did not send Children cards, letters, or financial support. *Id.* at 20, 22. Indeed, Mother testified that she made only one attempt to visit Children at an unspecified time in 2014. *Id.* at 47. Mother visited Paternal Grandmother's home unannounced, but Paternal Grandmother never answered the door. *Id.* Mother conceded that Paternal Grandmother did not appear to be home at the time and that her car was not outside. *Id.* at 47, 67. Paternal Grandmother testified that she never denied Mother contact with Children. *Id.* at 29.

Nonetheless, Mother blamed Paternal Grandmother and Father for her failure to maintain a relationship with Children. She insisted that Paternal Grandmother blocked her phone number. *Id.* at 41. While Mother admitted that she knew the location of Paternal Grandmother's residence, she claimed that she forgot the specific apartment number.[5] *Id.* at 46-47, 67. Mother also claimed that she had been sending messages to Father using Facebook "every single day" since Children began living with Paternal Grandmother in 2013, inquiring about Children, requesting visits, and asking for Paternal Grandmother's contact information.[6] *Id.* at 43-44, 64. Mother maintained that Father would respond by saying, "Oh, don't worry about [Children]. They're fine." *Id.* at 43. According to Mother, Father also refused to allow her to see Children because Mother was married, and he refused to provide her Paternal Grandmother's contact information, saying "that he was not [Mother's] secretary[.]" *Id.* at 44.

---

[5] Paternal Grandmother testified that she has lived in the same location for over twenty years, but that she changed her phone number "in the last year or so." N.T., 9/14/2018, at 21. She explained that Mother knew where her home was located because Mother had lived with her before T.J.R. was born. *Id.*

[6] Mother reported that she also attempted to contact Paternal Grandmother's daughter on Facebook, but that the daughter "blocked me … telling me that [Children] are not my concern." N.T., 9/14/2018, at 45. Paternal Grandmother testified that she attempted to obtain Mother's address "to sign the forms, because I was trying to get the consents" in January 2018. *Id.* at 28. Mother recalled that Paternal Grandmother contacted her asking for her address and stated that she "told her no. I told her, if she allows me to see or talk to [Children], I would want to give her my address. She didn't tell me, yes, you could see [Children], or anything." *Id.* at 46.

As this Court has explained, credibility and weight determinations are within the sound discretion of the orphans' court. *See In the Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017) ("The [o]rphans' [c]ourt is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."). Accordingly, the court was free to reject Mother's testimony that Paternal Grandmother and Father had prevented her from performing her parental duties. Even if the court had accepted Mother's testimony as credible, sending Facebook messages to Father by itself was not sufficient to preserve her parental rights. As stated above, case law requires that parents make efforts to resist obstacles limiting their ability to maintain a relationship with their children. *B.,N.M.*, 856 A.2d at 855. Mother testified that she made no efforts to resist the obstacles in this case at all. Instead, she claimed that she persisted with the futility of sending Facebook messages to Father every day for nearly five years. We discern no abuse of discretion.

Next, we consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to subsection 2511(b). The requisite analysis is as follows.

> S[ubs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his

or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

The orphans' court concluded that it would best serve Children's needs and welfare to terminate Mother's parental rights involuntarily so that Paternal Grandmother may adopt them. N.T., 9/14/2018, at 74. The court found that there was no parental bond between Children and Mother. *Id.* at 73. In addition, the court found that Paternal Grandmother provided Children with a safe and loving home, and that she was meeting Children's needs, nurturing them, and preparing them for school. *Id.*

Mother asserts that termination of her parental rights would be contrary to Children's needs and welfare because Paternal Grandmother does not facilitate contact between Children and Mother's three other children, who are

- 11 -

their siblings and/or half-siblings.[7] Mother's Brief at 17, 24. She further contends that the orphans' court erred by concluding that she does not share a bond with Children because Paternal Grandmother prevented her from contacting Children and did not even tell them that she exists. *Id.* at 17, 23-24. Finally, she alleges that Paternal Grandmother's only motive to adopt Children is financial gain. *Id.* at 17, 24.

We again discern no abuse of discretion. It is clear that Children do not share a significant parental bond with Mother. The last time Children saw Mother in 2013, T.J.R. was only two and a half years old, while T.R. was less than a year old. By the time of the termination hearing, T.J.R. was seven years old and T.R. was five and a half years old. *See In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008) (observing that the relationship between K.Z.S. and his mother "must be fairly attenuated," given that K.Z.S. had been in foster care most of his young life, and that he had only limited contact with his mother during that time). Paternal Grandmother testified that Children do not ask for Mother and "don't know to ask for her" because they do not know that she exists. N.T., 9/14/2018, at 27-28. Mother acknowledged her lack of

---

[7] Mother has five children in total, including Children. N.T., 9/14/2018, at 49. Mother's youngest two children are Children's half-siblings, as they are the children of Mother's current husband, and not Father. *Id.* at 51. It is not entirely clear whether Mother's oldest child is also the child of Father, although Paternal Grandmother's testimony suggests that this is not the case. *See*, *e.g.*, *id.* at 34 ("Then [Mother] was with another person. That's when she had her oldest daughter.").

- 12 -

a relationship with Children during the hearing when she expressed hope that Paternal Grandmother would "let [Children] know, when they get a little bit older, [that] I'm their mom and the reason why I couldn't be there for them." *Id.* at 54. Tellingly, Mother did not testify that she intended to resume caring for Children, but suggested instead that she should maintain her parental rights so that she can visit Children "once a year or whenever she allows me to see them[.]" *Id.* at 59.

Mother also asserted that maintaining her parental rights would allow her to facilitate a relationship between Children and their siblings and/or half-siblings. *Id.* at 61. While Mother is correct that sibling relationships may be a relevant factor when assessing a child's needs and welfare, Children's younger half-siblings were born after Children began living with Paternal Grandmother, and Children have never met them. *Id.* at 51. Moreover, only T.J.R. has ever met Children's older sibling or half-sibling, and that was approximately six years earlier when T.J.R. was a year old. It is doubtful that Children would be able to establish a significant relationship with their oldest sibling or half-sibling now, even if Mother were to retain her parental rights, given that the oldest child is not in Mother's care, and that Mother visits her only sporadically. *Id.* at 49-50, 66 (Mother stating that she visited her oldest child twice during the last twelve months). *Id.* at 65-66. We conclude that

terminating Mother's parental rights would best serve Children's needs and welfare.[8]

Based on the foregoing, the orphans' court did not abuse its discretion or commit an error of law by terminating Mother's parental rights involuntarily. Therefore, we affirm the court's September 17, 2018 decrees.

Decrees affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: 6/11/2019

_____

[8] We discern no support in the record for Mother's allegation that Paternal Grandmother wishes to adopt Children for financial gain. Mother appears to have based this claim entirely on Paternal Grandmother's statement in her termination petitions that she "will receive full credits and benefits from Social Security pending adoption." Petition for Involuntary Termination of Parental Rights (T.J.R.), 5/21/2018, at 1.