J-A27028-18

2019 PA Super 40

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.J.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.A., MOTHER AND P.F. | : | No. 1731 EDA 2018 |

Appeal from the Order Entered May 10, 2018
In the Court of Common Pleas of Monroe County
Orphans' Court at No: 86 OCA 2017

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

OPINION BY STABILE, J.:                    **FILED FEBRUARY 14, 2019**

B.A. ("Mother") and P.F. ("Fiancé") (collectively, "Petitioners")[1, 2] appeal

from the order entered May 10, 2018, which denied their petition to terminate

the parental rights of G.L.K., III ("Father"), involuntarily with respect to his

son, C.J.A. ("Child"), born in March 2012.  After careful review, we affirm.

The record reveals that Mother and Father dated for about three months

in 2011, prior to Child's birth.  N.T., 4/25/18, at 12.  At the time, both Mother

and Father lived in Luzerne County.  *Id.*; N.T., 3/1/18, at 5.  After Child was

born, Father questioned whether he was Child's father and sought a paternity

---

[1] While Mother appears to indicate in her brief that she is the sole appellant in this case, her notice of appeal states that both she and Fiancé are appealing together.

[2] During these proceedings, Mother indicated that she and Fiancé would be married in October 2018.  N.T., 3/1/18, at 27.  The record does not indicate whether the marriage actually took place.

test. N.T., 3/1/18, at 6. The test confirmed Father's paternity of Child and Mother obtained a child support order.[3] *Id.*

After receiving the results of the paternity test, Father began exercising partial physical custody of Child. *Id.* at 11. No custody order existed, but the parties reached an informal agreement providing Father with custody every other weekend. *Id.* at 11, 14. This began when Child was several months old and lasted about a year until Father separated from his new girlfriend. N.T., 4/25/18, at 16-17. The separation left Father homeless temporarily and his periods of custody ended because he had nowhere to go with Child. *Id.* About a week later, Father moved into his sister's home, which was directly across the street from Mother's home. *Id.* at 17. Father started visiting Child at Mother's home "[a]bout three or four times a week, . . . for about two hours." *Id.* at 18. This continued until October 2014, when Child was two and a half years old. *Id.* at 20; N.T., 3/1/18, at 8. At that time, Mother left her home near Father's sister and moved with Fiancé to Monroe County. N.T., 3/1/18, at 8. Father confronted Mother as she was preparing to leave and she informed him that he "would not see [Child] anymore." N.T., 4/25/18, at 20-21.

Mother did not tell Father where she and Child would be living and he struggled to locate them after they left. *Id.* at 21. Father retained Mother's

---

[3] Father has remained current on his child support obligation to the present day. N.T., 3/1/18, at 11.

phone number on his prepaid cellphone but "smashed" the phone accidently and was unable to retrieve the number. *Id.* at 22. He further discovered that Mother blocked him on Facebook. *Id.* at 24. Father occasionally drove by the home of Mother's parents to see if her car was there, but to no avail. *Id.* at 23. He also spoke to two of Mother's friends, but they informed him that they too did not know where Mother lived. *Id.* at 23-24.

In 2016, one of Mother's friends informed Father that Mother and Child may be residing in Monroe County. *Id.* at 25. Father conducted an internet search but did not learn anything new about Mother's whereabouts. *Id.* at 26. Later that year, in September 2016, Father's current girlfriend gave birth to his daughter. *Id.* at 27. This event inspired Father to renew his search for Mother and Child. *Id.* at 27, 45. In June 2017, Father decided to reach out to Mother's sister on Facebook. *Id.* at 27. He requested that Mother's sister pass along a message asking Mother to contact him so that he could spend time with Child without court intervention. *Id.* at 28. Mother initially failed to respond but relented after about a month because Father continued to send messages to her sister. *Id.* at 40, 58. Mother passed a message back to Father stating that she would not be contacting him. *Id.* at 57.

Undeterred, Father spoke to his lawyer about what he could do to locate Mother and Child. N.T., 4/25/18, at 29. Father's lawyer advised him to hire a private investigator and file a custody complaint. *Id.* at 30. Father utilized a private investigation website, which revealed Mother's phone number but not her new address. *Id.* Father also filed a complaint for custody in Luzerne

County. *Id.* Father tried to serve Mother by mailing the relevant documents to her parents' home, but Mother's parents returned the documents to Father. *Id.* at 31-33.

After consulting a police officer, Father also began searching publically available criminal docket sheets. *Id.* at 29, 34. Father's search revealed that Mother had an active criminal case.[4] *Id.* at 35. In approximately September 2017, Father and his lawyer contacted the office of the magistrate handling the case and obtained a copy of the criminal complaint, which contained a new address for Mother. *Id.* at 35-37. Later that month, Father hired Constable Charles West to serve Mother personally. *Id.* at 4-5. Constable West could not locate Mother at the addresses Father provided,[5] but was able to contact Fiancé by calling the phone number that Father obtained using the private investigation website. *Id.* at 5-6, 10, 65. According to Constable West, Fiancé "pretty much told me that they're not going to tell me where they are at because [Father] will never see his daughter or his children [*sic*] again. And told me to go F myself, and have a nice day." *Id.* at 6.

In November 2017, Father obtained an order permitting him to serve Mother by publication. *Id.* at 37-39. The Luzerne County trial court conducted a custody conciliation in January 2018, at which Mother failed to appear, and

---

[4] Mother testified that the charges "were all dropped." N.T., 3/1/18, at 70.

[5] Mother had moved to her current address earlier in the year. N.T., 3/1/18, at 5.

entered an interim custody order. *Id.* at 41; Petitioners' Exhibit 4. Shortly thereafter, Father received notice that Petitioners filed a petition to terminate his parental rights involuntary in Monroe County on December 28, 2017.[6] *Id.* at 41. Petitioners also filed a custody complaint in Monroe County and preliminary objections in Luzerne County challenging the proceedings based on improper venue. N.T., 3/1/18, at 19-22. The Luzerne County trial court vacated its interim order and directed that all future custody proceedings occur in Monroe County. *See* Petitioners' Exhibit 5.

On March 1, 2018, and April 25, 2018, the Monroe County orphans' court conducted a hearing on the involuntarily termination petition. The court heard the testimony of Mother, Fiancé, Constable West, and Father. Following the hearing, by order entered May 10, 2018, the court denied the petition. In its opinion accompanying the order, the court found that the Adoption Act would not permit Fiancé to adopt Child because he and Mother were not yet married. Orphans' Court Opinion, 5/10/18, at 5-8. The court further observed that Petitioners filed their termination petition to thwart Father's custody case, which was contrary to the purposes of the Act. *Id.* at 8-9. In addition, the court found that Petitioners failed to prove grounds for termination of Father's parental rights pursuant to Section 2511(a)(1) of the Act. *Id.* at 10-16. The court reasoned that Father attempted to reestablish a relationship with Child in the six months immediately preceding the filing of the termination petition

---

[6] Fiancé also filed a petition for adoption and a report of intention to adopt.

but that Mother created barriers to prevent his success. *Id.* at 12-16. The court described Father's testimony as "credible and convincing" but rejected Mother's testimony, observing that her "demeanor in Court was less than convincing and she appeared angry that Father wanted to be a part of the child's life." *Id.* at 14-16. Petitioners timely filed a notice of appeal on June 11, 2018,[7] along with a concise statement of errors complained of on appeal.

Petitioners now raise the following issues for our review.

1. Did the [orphans' c]ourt err by finding, based on the marital status of the parties, that [Fiancé] could not petition for adoption under the act despite th[e] fact that the parties have been together for years, intend to get married and have set a date, have [a] child in common who is a sibling to [Child] and [Fiancé] has raised the child as his own?

2. Did the [orphans' c]ourt err in finding that Father's minimal efforts by attempting to locate and file for a custody modification after a greater than three-year absence, w[ere] enough to overcome the evidence of clear abandonment and intent to relinquish his parental rights and fail[ure] to perform any essential duties?

_____

[7] Generally, a party must file his or her notice of appeal within thirty days after entry of the order. *See* Pa.R.A.P. 903(a) ("Except as otherwise prescribed by this rule, the notice of appeal . . . shall be filed within 30 days after the entry of the order from which the appeal is taken."). Thirty days after May 10, 2018, was Saturday, June 9, 2018. Thus, Petitioners timely filed their notice of appeal on Monday, June 11, 2018. *See* 1 Pa.C.S.A. § 1908 ("Whenever the last day of any such period shall fall on Saturday or Sunday, . . . such day shall be omitted from the computation.").

3. Did the [orphans' c]ourt place too much weight upon the alleged efforts [M]other took to block contact and fail[] to account for the best interest of the child in view of [F]ather's clear intent for several years to abandon his responsibilities by making no effort at all to establish [] contact with much less parent[] [] the minor child?

Petitioners' Brief at 5 (suggested answers omitted).

We consider these claims mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Before reaching the merits of this appeal, we discuss *sua sponte* Child's right to counsel. *See In re Adoption of T.M.L.M.*, 184 A.3d 585, 588 (Pa. Super. 2018) (addressing the child's right to counsel *sua sponte* "as children are unable to raise the issue on their own behalf due to their minority.").

The Adoption Act requires that children receive counsel in all contested involuntarily termination proceedings.

**(a) Child.--**The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other

- 7 -

proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a).

The term "counsel" in Section 2313(a) refers to an attorney directed by the child who represents his or her legal interests. ***In re Adoption of L.B.M.***, 161 A.3d 172, 180 (Pa. 2017). As our Supreme Court has explained, a child's legal interests are distinct from his or her best interests. ***Id.*** at 174. A child's legal interests are synonymous with his or her preferred outcome, while the orphans' court must determine a child's best interests. ***Id.*** In a recent case, the Court explained that a single attorney may represent both a child's best interests as his or her guardian *ad litem* ("GAL") and that child's legal interests as counsel pursuant to Section 2313(a), but only if no conflict exists between the two sets of interests. ***In re T.S.***, 192 A.3d 1080, 1088 (Pa. 2018).

Concerning the responsibilities of counsel when representing a child, this Court has stated that effective representation requires, "at a bare minimum, attempting to ascertain the client's position and advocating in a manner designed to effectuate that position." ***T.M.L.M.***, 184 A.3d at 590. We also find instructive Section 6311 of the Juvenile Act and Rule 1154 of our Rules of Juvenile Court procedure, which govern the duties of a GAL representing a child's legal and best interests in a dependency proceeding. ***See T.S.***, 192 A.3d at 1089-90 (finding Section 6311(b)(9) instructive and applying it to interpret Section 2313(a)). The relevant provisions require that a child's GAL

determine his or her wishes "to the extent that they can be ascertained . . . . When appropriate because of the age or mental and emotional condition of the child[.]" 42 Pa.C.S.A. § 6311(b)(9); Pa.R.J.C.P. 1154(A)(9).

In the instant matter, Hillary Madden, Esquire, represented Child during the termination proceedings. While the transcripts of the hearing list Attorney Madden as Child's GAL, the orphans' court appointed her solely as Child's legal counsel. *See* Order, 1/11/18. During the hearing, Attorney Madden did not present any evidence of her own, but did cross-examine the witnesses. She also made two statements regarding her position as Child's counsel. Both statements related to the fact that Child did not remember Father, whom he had not seen since at least October 2014, and believed Fiancé to be his biological parent. On March 1, 2018, concerning the question of whether the court should conduct an interview of Child, Attorney Madden stated as follows.

> I met with him. He is five.[8] He doesn't really have a very large attention span because he is five years old, and I wouldn't want him to have to sit outside for an entire hearing.
>
> So my only thought was if Your Honor wanted to talk to him just about the adoption portion. Obviously, he wouldn't have anything to say about the TPR because everyone testified he's not even aware [Father] is his father. So, I would leave it up to the Court's discretion if you want to talk to him about the adoption.

N.T., 3/1/18, at 104.

---

[8] Child turned six later that month.

In addition, at the conclusion of the hearing, Attorney Madden stated the following.

> Your Honor, as we discussed in the last hearing, I don't have any testimony. [Child] is not here because of his age, and as Your Honor is well aware because of the nature of the fact that he does not know that he is the father -- his biological father.

N.T., 4/25/18, at 67-68.

Finally, Attorney Madden filed a brief in this Court, addressing at length her representation of Child. Attorney Madden explains as follows, in relevant part.

> . . . . [D]ue to the age and maturity of [Child] along with the fact that he did not know [Father] was his biological father, the undersigned, as legal counsel, was unable to explain the termination of parental rights proceeding and/or discuss the potential adoption by [Fiancé].
>
> ***
>
> As a result, the undersigned was unable to set forth a position on the record since the undersigned was only appointed as legal counsel and not as a [GAL] and it could not be sufficiently ascertained as to what [Child's] position would be regarding the termination of parental rights. However, the undersigned was able to view the relationship between [Child] and [Fiancé] and it was clear that the two had a strong bond particularly because [Child] identified [Fiancé] as his biological father and had never been told otherwise.

Child's Brief at 1-2.

Under the unique circumstances presented here, we find that Attorney Madden's representation of Child complied with the minimum requirements of Section 2313(a). While Child was just over six years old at the conclusion of

- 10 -

the termination hearing and may have been articulate enough to express his legal interests, he did not and could not possess a preferred outcome in this case. Child was still quite young and did not even realize that Father existed. Moreover, it may have been confusing and traumatic for Attorney Madden to tell Child that Father existed and it was a reasonable judgment on her part not to do so. Thus, Attorney Madden discharged her duty as Child's counsel to the best of her ability, based on his age, mental condition, and emotional condition, and we see no basis upon which to remand this matter for further proceedings.

Because we conclude that Child received adequate representation of his legal interests in accordance with **L.B.M.** and its progeny, we may now turn to the merits of this appeal. We focus our analysis on Petitioners' second and third claims, in which they challenge the finding of the orphans' court that they failed to present clear and convincing evidence to terminate Father's parental rights.[9]

Section 2511 of the Adoption Act governs involuntary termination of parental rights. **See** 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for

---

[9] In light of our conclusion with regard to Petitioners' second and third claims, we need not consider their first claim, in which they argue that the orphans' court erred by finding that the Adoption Act would not permit Fiancé to adopt Child.

- 11 -

termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Petitioners filed their petition pursuant to Sections 2511(a)(1) and (b)

which provide as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

For a petitioner to meet the requirements of Section 2511(a)(1), he or she "must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008). The orphans' court must then consider the parent's explanation for his or her abandonment of the child, in addition to any post-abandonment contact. *Id.* (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)). A parent does not perform parental duties by displaying a merely passive interest in the development of his or her child. *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (citations omitted).

Instantly, Petitioners maintain that the orphans' court erred by denying their petition to terminate Father's parental rights based on his "very minimal

recent effort" to reestablish contact with Child. Petitioners' Brief at 16. They emphasize that courts must consider the whole history of a given case and not just the six months immediately preceding the filing of the petition. *Id.* at 18-20 (citing *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999)). They assert that Father's abandonment of Child was so lengthy that his belated attempts to perform parental duties during the relevant six months were not sufficient to preserve his parental rights. *Id.* at 19-20. Petitioners further contend that the court placed too much weight on the alleged obstacles Mother created to prevent Father from performing parental duties. *Id.* at 20. They suggest that creating obstacles may have been "the right thing to do" in order to protect Child from the trauma of being reintroduced to Father after so many years. *Id.* at 20-22.

We discern no abuse of discretion by the orphans' court. As explained in our factual summary of this case above, Petitioners filed their involuntary termination petition on December 28, 2017. Thus, the six-month period set forth in Section 2511(a)(1) began to run on June 28, 2017. During that time, the record is clear that Father did nearly everything within his power to reestablish a relationship with Child and perform parental duties. Beginning in June 2017, Father contacted Mother's sister on Facebook in an attempt to arrange visits with Child. He consulted his lawyer concerning ways to locate Mother and Child. Father then used a private investigation website to search for Mother and filed a custody complaint in Luzerne County. He spoke to a

police officer, searched publically available criminal dockets, and discovered that Mother had an active criminal case. Father and his lawyer contacted the office of the magistrate handling the case in an effort to obtain Mother's address. He attempted to serve Mother personally by hiring Constable West and then resorted to service by publication. Finally, Father attended a custody conciliation and even obtained a custody order in Luzerne County. While it is true that Father did not actually succeed in making contact with Child, he strove to overcome the obstacles that Mother placed in his path. *B.,N.M.*, 856 A.2d at 855.

Further, while Petitioners are correct that orphans' courts must consider the whole history of a given case and not just apply the relevant six-month period mechanically, the fact remains that the six-month period is the most critical part of the court's analysis. *D.J.S.*, 737 A.2d at 286. If we were to accept Petitioners' argument and reverse the order of the orphans' court, we would be ignoring the six-month period almost entirely. Because the Adoption Act required the court to focus its attention on the six months immediately preceding the filing of the petition, and because the record supports the court's decision that Father made substantial efforts to perform his parental duties during that time, Petitioners are not entitled to relief. *See In the Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017), *appeal denied*, 170 A.3d 991 (Pa. 2017) ("The Orphans' Court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations

and resolve conflicts in the evidence."); ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010) ("Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.").

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion or commit an error of law by denying the petition to terminate Father's parental rights involuntarily. Therefore, we affirm the court's May 10, 2018 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/19