J-S64045-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: P.G.F | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.F., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1284 WDA 2019 |

Appeal from the Order Entered August 7, 2019
In the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  No. 3 AD 2018

BEFORE:  BOWES, J., LAZARUS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED JANUARY 27, 2020**

K.F. (Father) appeals from the August 7, 2019 order of the Bedford County Orphans' Court (trial court) granting the petition of T.G.H. (Mother) and E.N.H. (Husband) to terminate Father's parental rights to his son, P.G.F. (Child).  This case returns to our court after a remand to determine whether Child was entitled to appointment of legal counsel in addition to his guardian *ad litem* (GAL).  ***See In re P.G.F.***, 1464 WDA 2018 at *10 (Pa. Super. March 13, 2019) (unpublished memorandum).  After careful review, we affirm.

**I.**

The previous panel of this Court summarized the facts of this matter:

Mother and Father, who never married, gave birth to Child in July 2012.  ***See*** N.T., 7/31/18, at 6-7.  At the time of Child's birth, Mother and Father were living with Mother's parents (Maternal

_____

[*] Retired Senior Judge assigned to the Superior Court.

Grandparents). *Id.* at 7. However, when Child was approximately a month-and-a-half or two months old, Mother and Father ended their romantic relationship, and Father moved out of the residence. *Id.* at 7-8.

Mother and Child continued to reside with Maternal Grandparents until Maternal Grandparents ended their marriage. *Id.* at 9-10. Mother and Child moved with Maternal Grandmother among several residences in Bedford County. *Id.* at 8-10. In 2013, Mother filed a custody action against Father. *Id.* at 11. In May 2014, Mother and Father entered into a custody agreement, where Father had physical custody every other weekend. *Id.* at 12. Father was able to exercise his custody rights for approximately eight months, when Child was approximately three years old. *Id.* at 20.

In October 2017, Mother married [Husband]. *Id.* at 5. They began residing together immediately after marriage. *Id.* at 8. On February 27, 2018, Mother and Husband filed a petition seeking to involuntarily terminate Father's parental rights. The court appointed Carole Rose, Esq., as guardian *ad litem*/legal counsel to represent Child.[]

The court held evidentiary hearings on July 31, 2018, and September 11, 2018. Mother, D.H. ("Paternal Grandmother"), Husband, and Father testified. Attorney Rose was present at the hearing and cross-examined the witnesses.

Mother testified that when she and Father first ended their relationship and up until the time that Child was approximately one year old, they attempted to co-parent. *Id.* at 10-11. Following the custody agreement in May 2014, Father exercised his custody rights for approximately eight months, or "a few" months into 2015. *Id.* at 17-23. However, visitation "slowed down," and Paternal Grandmother became more involved with Child and took Child when Father was to exercise his custody rights. *Id.* at 12-14. Mother claimed that, over the last five years, custody had always been shared between Mother and Paternal Grandmother, and Father had not picked up Child from Mother's custody in that time. *Id.* at 14.

Mother also claimed that Father had no contact with her, and never inquired about Child on birthdays or holidays, or when Child required surgery to remove his tonsils and adenoids when Child

was three years old. *Id.* at 15-16. Mother texted Father and sent him Facebook messages about doctor's appointments but never received a response. *Id.* at 15-16, 46-47. Mother denied that Father or Paternal Grandmother sent Child birthday cards, Christmas cards, or gifts, although he did give gifts and cards to his other child. *Id.* at 29, 35. However, Mother received child support from Father. *Id.* at 27.

Mother admitted that Child sometimes stated that Father was at Paternal Grandmother's house. *Id.* at 26. However, she disagreed that Child had an overnight stay with Father in the last three years. *Id.* at 29-30. Mother denied that Child referred to Father as "dad." *Id.* at 26. According to Mother, Child refers to Husband as "dad," and to Father by his first name, or as "Grammy [Paternal Grandmother]'s friend." *Id.* at 29-31. Mother claimed that Child did not know Father was his biological father. *Id.* at 31. Mother disagreed that she hid her whereabouts from Father or blocked him on social media. *Id.* at 20-21, 34. However, on cross-examination, she admitted that she sent text messages stating that she did not want Father to be around Child, and that she did not want Child to be taken to Paternal Great-Grandmother's house. *Id.* at 55-62. Mother stated that if Father had contacted her at the end of 2015 regarding his court-ordered custody periods, she probably would have said "yes," but as time passed without his visits, she would have said "no". *Id.* at 63-64.

Mother testified that she wishes for Husband to be able to adopt Child, because he performs fatherly duties for Child, and because Mother and Husband are expecting a child of their own. *Id.* at 39-40. Mother stated she would not prevent Paternal Grandmother from seeing Child if Father's parental rights were terminated. *Id.* at 43-44.

Paternal Grandmother testified that Father has seen Child "even more than what [Mother] has said or maybe even realized." *See* N.T., 9/11/18, at 7. Paternal Grandmother indicated she does not refer to Father as such in front of Child, and instead calls Father by his first name to avoid confusing Child. *Id.* at 8. Although Father is often around when Paternal Grandmother has custody of Child, when Mother told Paternal Grandmother that she was not allowed to have Father around Child, she obeyed. *Id.* at 10. Paternal Grandmother believed that Mother made it difficult for Father to be in Child's life and this was about the time that his relationship with Child changed. *Id.* at 13, 32. At first, Father

was there "one hundred percent" but that eventually "it just seemed like it was easier for him not to fight and argue to get [Child]." *Id.* at 14. Paternal Grandmother also admitted that Father had not had a father-son relationship with Child for the last two years. *Id.* at 22. However, she attributed this to the "strain" with Mother and noted that Father was a good father to his other child. *Id.* at 38. Paternal Grandmother denied that she took Child because Father was not caring for Child appropriately. *Id.* at 46-47.

Husband testified that his relationship with Child is "really good," and that he tries to not be involved in any issues involving Mother, Father, and Child. *Id.* at 53-54. Husband stated that Child calls him "dad," and respects him as a paternal figure. *Id.* at 55-56. Child has never brought up Father to Husband. *Id.* at 55. In cross-examining Husband, Attorney Rose noted she had spoken with Child:

> [Attorney Rose]. So, when I spoke with [Child,] I asked him who he lived with and he named mom, and he must have named your parents['] names and your brothers, but I had to ask him several times to get him to say it. He said, [Husband's nickname].
>
> [Husband]. Yeah. Could be it.
>
> [Attorney Rose]. And I said, I'm sorry, I had to ask him a couple times to repeat that. He was very specific he lived with his mom and [Husband's nickname]. I had to look at the petition for your name and he said yes. But he never referred to you as dad. Does that surprise you?
>
> [Husband]. Not necessarily.

*Id.* at 61. Husband explained that Child, in addition to "dad," occasionally calls Husband by his nickname. *Id.* at 61.

Father testified that he has two children: Child and a younger daughter. *Id.* at 64-65. Although he has no custody order for his daughter, he has had no issues sharing custody with his daughter's mother. *Id.* at 65. Father testified, that, at the time of Child's birth, he and Mother were both working full time, and maternal and paternal grandparents helped care for Child. *Id.* at

68. When Father was home, he cared for Child, including changing his diaper. *Id.* at 68. After Father and Mother separated, Father had partial custody of Child at his home every other weekend, and one overnight during the week. *Id.* at 68-69. At some point, Paternal Grandmother began taking custody of Child; Father claimed this was because his daughter's mother and Mother did not get along. *Id.* at 72-73. Father then "stopped trying" because he was "tired of the games." *Id.* at 74-75. Father also noted that about a year prior to the termination hearing, Mother had asked him to voluntarily relinquish his parental rights. *Id.* at 100.

With respect to his interactions with Child, Father described Child not talkative, and that Father did not want to "push" himself onto Child or scare him away. *Id.* at 80. Father stated that although Child calls Father by his first name, Child did "not always" do so. *Id.* at 94. Father testified that he was present for several of Child's birthdays, including Child's fourth, and Christmas in 2017. *Id.* at 82-83. Father denied taking inappropriate care of Child, in response to Mother's averments that Father had failed to change Child's diapers. *Id.* at 83-84. Father stated he could not attend Child's tonsils surgeries because he had to work. *Id.* at 85. Father acknowledged that the garage where he works is very close to Paternal Grandmother's residence, and he would often walk to the house to see Child. *Id.* at 95.

*In re P.G.F.*, 1464 WDA 2018 at *1-7 (footnote omitted).

On remand to the trial court to determine whether Child's legal interests conflicted with his best interests and, if necessary, to appoint separate legal counsel for Child, the trial court found that there was no conflict between Child's legal and best interests. Notes of Testimony ("Remand Hearing"), 8/7/19, at 23. The trial court reinstated its order of September 27, 2018, terminating Father's parental rights. *Id.* at 24-25. Father timely filed a notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925.

On appeal, Father argues that the trial court erred in determining that there was no conflict between Child's legal and best interests. He also argues that his parental rights should not have been terminated because clear and convincing evidence did not establish a settled purpose on his part of relinquishing those rights or that he failed to perform parental duties for at least six months prior to the filing of the petition.[1]

## II.

### A.

As to his argument that that the trial court erred in determining that there was no conflict between Child's legal and best interests, the Adoption Act requires that counsel be appointed for a minor child in any involuntary termination of parental rights proceeding in which a parent contests the termination. 23 Pa.C.S. § 2313(a). In *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (plurality), a majority of our Supreme Court held that this provision requires that counsel be appointed to represent the child's "legal interests."[2] *Id.* at 183-84. In addition to considering the child's legal

---

[1] Father does not argue that termination of his parental rights did not serve Child's best interests pursuant to 23 Pa.C.S. § 2511(b). *See In re J.T.M.*, 193 A.3d 403, 408 n.5 (Pa. Super. 2018) (holding that appellant waived any challenge to the trial court's determination under Section 2511(b) by failing to raise it in his concise statement and brief).

[2] A child's legal interests "are synonymous with the child's preferred outcome." *In re Adoption of L.B.M.*, 161 A.3d 172, 174 (Pa. 2017) (plurality). In contrast, "'[b]est interests' denotes that a [GAL] is to express what the [GAL]

interests, the trial court must also determine what outcome would be in the child's best interests. *Id.* at 174; 23 Pa.C.S. § 2511(b).

The Supreme Court later clarified that a GAL who is appointed to represent the best interests of the child may also serve as the child's legal counsel when there is no conflict between the child's legal and best interests. *In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018). On review, this court must afford substantial deference to the trial court's factual and credibility determinations regarding whether there is a conflict between the child's legal and best interests. *In re Adoption of K.M.G.*, __ A.3d __, 2019 WL 4392506, at *4 (Pa. Super. September 13, 2019) (*en banc*).

The record reflects that on remand, Attorney Rose consulted with Child and determined that Child's preferred outcome was to remain with Mother and Husband. Remand Hearing at 6, 8-9, 16. In fact, Child became upset when considering the possibility of not living with Mother and Husband. *Id.* Child identified Husband as his father and did not seem to remember Father at all. *Id.* at 5, 12, 16. When asked if he knew anyone by Father's name, Child could only recall a classmate who shares the same name as Father. *Id.* at 5-6, 12, 18-19. He did not appear to recall spending any time with Father. *Id.* at 10-

---

believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees." *Id.* at 174 n.2 (quoting Pa.R.J.C.P. 1154 cmt.).

11. He identified Husband's parents as his own grandparents. *Id.* at 5. In light of these facts, the trial court's determination that Child's legal and best interests do no conflict is well-supported by the record and it did not err in declining to appoint separate legal interests' counsel for Child.[3]

**B.**

As to the merits, Father contends that the trial court abused its discretion in holding that there was clear and convincing evidence to support the termination of his parental rights. "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [the subsections of 23 Pa.C.S. § 2511(a)]." *In re Adoption of J.N.M.,* 177 A.3d 937, 942 (Pa. Super. 2018) (quoting *In re L.M*., 923 A.2d 505, 511 (Pa. Super. 2007)). Clear and

---

[3] The dissent argues that Attorney Rose did not fulfill her duties as legal interests counsel because she did not explain to Child that Father was his biological father and specifically ask how Child felt about terminating Father's rights. When this case was remanded for a hearing on Child's best and legal interests over a year after the initial hearings, Attorney Rose determined that Child no longer remembered Father. This Court held that legal counsel correctly discharged her duty in similar circumstances in *In re Adoption of C.J.A.*, 204 A.3d 496, 502 (Pa. Super. 2019). There, legal counsel declined to explain to the child that he had a biological father when the child was not aware that the biological father existed. *Id.* We agreed that under the unique circumstances, where the child did not know his father at all, legal counsel had correctly discharged her duty based on the child's age, mental condition and emotional condition in declining to explain those circumstances, particularly when the child had already bonded with his proposed adoptive father. *Id.* The same analysis applies here.

convincing evidence is that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re D.L.B.*, 166 A.3d 322, 326 (Pa. Super. 2017) (citation and quotation marks omitted). The orphans' court may then enter a final decree of involuntary termination if it is in the child's best interests as outlined in Section 2511(b). *Id.*[4]

To terminate parental rights, it must be shown "by conduct continuing for a period of at least six months immediately preceding the filing of the petition either [] evidenced a settled purpose of relinquishing parental claim to a child or [] refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). "[P]arental rights may be terminated pursuant to Section 2511(a)(1) if the parent **either** demonstrates a settled purpose of relinquishing parental claim to a child **or** fails to perform parental duties." *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003) (citation omitted; emphasis added). "Although the six month period immediately preceding the filing of

---

[4] We review such a decree for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *In re Interest of D.F.,* 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re A.S.*, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id.*

the petition is most critical to the analysis, the court must consider the whole history of the case and not mechanically apply the six-month statutory provision." *In re I.J.*, 972 A.2d 5, 10 (Pa. Super. 2009).

This court has defined "parental duties" as "a positive duty which requires affirmative performance" to meet the physical and emotional needs of the child. *In re Adoption of N.N.H.*, 197 A.3d 777, 784 (Pa. Super. 2018) (internal quotations and citation omitted). Moreover,

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with ... her physical and emotional needs.

*Id.* Merely providing financial support without maintaining an emotional relationship is not sufficient to fulfill parental duties. *In re Shives*, 525 A.2d 801, 803 (Pa. Super. 1987). When one parent creates obstacles to a noncustodial parent's relationship with his child, this court must consider the noncustodial parent's explanation for failure to perform parental duties to determine whether the parent used "all available resources to preserve the parent-child relationship." *Id.*

Even when one parent creates obstacles to the other parent's exercise of parental rights and duties, the law requires that the noncustodial parent exercise reasonable firmness to overcome those obstacles rather than

- 10 -

passively acquiesce to the other parent's actions. *See C.M.S.*, 832 A.2d at 464. In *C.M.S.*, mother unilaterally arranged for adoption and placement of the child immediately following her birth and without notifying father. *Id.* at 459. When father learned of the placement, he was advised that he would receive paperwork once the adoption process began and the adoption intermediary refused to provide him with any information regarding the child's whereabouts. *Id.* at 463 (citation omitted). Rather than taking any further action to initiate custody proceedings, father waited 14 months until he was served with adoption paperwork to challenge the proceedings. *Id.*

This court held that father's failure to act for 14 months did not satisfy his obligation to pursue his parental rights and duties with reasonable firmness. *Id.* at 463-64. While father had verbally opposed adoption when he spoke with the intermediary, he took no further action to assert his rights, perform parental duties or form a relationship with his child. *Id.* at 464. Accordingly, we held that there was clear and convincing evidence to terminate his parental rights under Section 2511(a)(1). *Id.*; *compare In re Adoption of C.J.A.*, 204 A.3d 496, 505 (Pa. Super. 2019) (holding that record did not support termination when, despite mother's efforts to prevent father from seeing child, father did "everything in his power to reestablish a relationship with [c]hild and perform parental duties," including hiring a private investigator and initiating a custody action).

In this case, the record supports the trial court's conclusion that Father failed to perform his parental duties for at least six months preceding the filing of the petition. Significantly, although Father was aware that the custody order in place awarded him regular periods of custody of Child, he made no effort to enforce the order once Mother stopped delivering Child for his periods of custody. N.T., 9/11/18, at 68-69. Father knew that he could petition the court to enforce or modify the custody order that was in place, as he had petitioned *pro se* in 2014 to modify the order when he wanted to exercise custody over Child during the holidays. *Id.* at 70, 75-78, 86-90. Nonetheless, for at least two years before Mother filed the petition to terminate Father's parental rights, Father made no effort to enforce his right to custody of Child or build the father-son relationship. Instead of showing reasonable firmness, he passively acquiesced to Mother's obstacles and testified that because he was "tired of the games," he elected to "stop trying." *Id.* at 74-75.

Both Paternal Grandmother and Father admitted that Father's relationship with Child had become strained and Child does not see him as his father. *Id.* at 20, 22, 80-81, 96. Paternal Grandmother also acknowledged that Child currently views Husband as a father figure, though she believed that given the chance, Father could reestablish himself as a father figure to Child. *Id.* at 38, 50. Father stated that in the six months to one year prior to the hearing, he had had contact with Child "a handful of times" and that he did not have a relationship with Child for the prior two years. *Id.* at 79, 96.

Further, Mother testified that Father had not spoken to her to request custody of Child since 2015. N.T., 7/31/18, at 33, 50.

While the record reflects that Mother, as early as December 2016, created barriers to Father's ability to exercise custody and maintain a parent-child relationship, Father failed to respond to these efforts with any degree of "reasonable firmness" to perform parental duties. *Id.* at 63-64. The obstacles created by Mother were in place during the relevant six-month period prior to the filing of the petition, but the record supports the trial court's finding that these obstacles emerged only after years of Father's virtual non-participation in the care and custody of Child. *Id.* at 17-23, 63-64. Further, even though Father complied with a domestic relations order to pay child support to Mother, payment of support in absence of a parent-child relationship or emotional bond is insufficient to establish that Father performed his parental duties. *Id.* at 27; N.T. 9/11/18 at 107-08; *Shrives*, *supra*.

The record supports the trial court's conclusion that Father failed to perform his parental duties for at least six months prior to the filing of the petition. Accordingly, we affirm the order terminating Father's parental rights.

Order affirmed.

Judge Lazarus joins the memorandum.

Judge Bowes files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/27/2020</u>