J-S08038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.M.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1450 MDA 2021 |

Appeal from the Decree Entered October 11, 2021
In the Court of Common Pleas of Lycoming County Orphans' Court at
No(s):  2021-6749

BEFORE:  BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:          **FILED: MARCH 10, 2022**

M.H. (Father) appeals from the decree entered in the Lycoming County Orphans' Court involuntarily terminating his parental rights to his son, A.M.H. (Child) born in January of 2018.  Because we discern no error or abuse of discretion in the orphans' court ruling, we affirm.

The orphans' court provided the following findings of fact in its opinion accompanying the order terminating Father's parental rights:

> 1. [Child] was born [in] January [of] 2018[, and] currently resides with . . . Mother . . . and Mother's Husband, [C.G. (Husband) in] Jersey Shore, Pennsylvania.  Mother and Husband have been married since September 4, 2021.
>
> 2. [ ]Child's biological Father is [Father]. Father resides [in] Millville, Pennsylvania.
>
> 3. At the time of [ ] Child's birth, Mother and Father were unmarried, but in a relationship.
>
> 4. When Mother returned to work after giving birth, Father stayed at home with [ ] Child.

5. Mother and Father began having issues in their relationship when [ ] Child was approximately 6 months old. The last time Mother and Father lived together was in July of 2019.

6. Father attended the Child's doctor appointments until he was a year [and a half] old.

7. Mother and Husband started dating in September 2019, and began residing together in November of 2019.

8. When Mother and Father separated, Father did not have transportation[, or a driver's license,] and would see the Child when Mother would pick him up or when his cousin would take him to Mother's house.

9. Father had the Child for one overnight after the parties separated in 2019.

10. When Mother and Father first separated, they agreed that Father would pay Mother $150 per month to help with day care expenses. Father testified that he stopped making this payment after a few months because Mother stopped allowing him to see [ ] Child.

11. Father saw [ ] Child around Easter of 2020. Father's cousin made the arrangements with Mother for the visit.

12. Father brought [ ] Child gifts for Easter but had minimal other interactions with the Child during the visit.

13. Father next saw [ ] Child in November of 2020, when Mother visited Father's cousin and Father was living there. Father did not request this visit, and Mother testified that he was more interested in his phone than interacting with [ ] Child.

14. November 2020 was the last in-person contact Father had with [ ] Child.

15. On February 2, 2021, Father sent Mother $150, which Mother said would go towards [ ] Child's insurance.

16. Father testified that he made payments of $150 in January, February, and March of 2021.

17. In May of 2021, Mother attempted to notify Father about [ ] Child's potential exposure to Covid. Mother testified that Father and his girlfriend reported her to the police and accused her of harassment. Mother further testified that upon the advice of the

police, she blocked Father from her social media at that time, but that she did not block him from calling or texting her.

18. On May 27, 2021, Mother filed the Petition for Involuntary Termination of Parental Rights and Petition for Adoption.

19. Also on May 27, 2021, Mother filed a Complaint for Custody and Petition for Special Relief at Lycoming County docket #21-20467.

20. A custody conference was held on June 16, 2021. Mother attended and was represented by Sharon McLaughlin, Esquire. Father attended and was represented by John Gummo, Esquire.

21. Following the conference, a custody Order was entered on June 16, 2021, which granted Mother sole legal and physical custody. A pre-trial conference was scheduled for August 5, 2021, and subsequently continued until September 8, 2021.

22. However, on July 19, 2021, counsel for Mother and Father filed a Joint Stipulation to Stay Proceedings, and the pre-trial conference was canceled pending the outcome of the hearing on the Petition for Involuntary Termination of Parental Rights.

23. Mother and Father had multiple previous conversations about the possibility of Mother's Husband adopting [ ] Child, with the last one occurring in August of 2020.

24. On August 5, 2021, Father texted Mother to ask about [ ] Child. Mother responded that Father had the wrong number, despite the fact that the number Father texted was still her phone number.

25. [ ] Child has not asked about Father since their last contact in November of 2020.

26. Father has not provided [ ] Child with gifts or cards for Christmas or his birthday since [ ] Mother and Father separated.

27. The Child refers to Mother's Husband as "Daddy." They have a very close relationship.

28. The Child refers to Father [by his first name]. Father testified that he corrected [ ] Child one time. Mother testified that Father refers to Mother's Husband as "Daddy" when speaking to the Child about him.

29. Mother's Husband desires to proceed with adopting the Child if the Petition for Involuntary Termination of Father's Parental Rights is granted.

Orphans' Ct. Op. and Order, 10/11/21, at 2-5 (record citation omitted).

As noted above, Child has lived with Mother since she and Father separated in July of 2019. Mother began living with her now Husband in November of 2019, and they later married in September of 2021. Thus, Child has lived with Mother and Husband since November of 2019, when he was 23 months old.

On May 27, 2021, Mother filed both a petition seeking to involuntarily terminate Father's parental rights and a complaint for custody. Concomitantly, Husband filed a petition seeking to adopt Child. As the orphans' court explained, Mother was awarded sole legal and physical custody of Child at a conference held on June 16, 2021.[1] Although a pre-trial conference was scheduled for September 2021, on July 19, 2021, counsel for both parties filed a joint stipulation to stay the custody proceedings pending the outcome of the termination proceedings. The orphans' court conducted the termination hearing on October 5, 2021, at which time Mother, Husband and Father testified. Thereafter, on October 11, 2021, the court entered an

_____

[1] The record of the custody matter is not included in the certified record on appeal.

- 4 -

opinion and decree involuntarily terminating Father's parental rights pursuant

to 23 Pa.C.S. § 2511(a)(1) and (b).  This timely appeal follows.[2]

Father presents one issue on appeal:

Whether the [orphans'] court erred in terminating the parental rights of [Father] pursuant to 23 Pa.C.S. § 2511(a)(1) when, in the six months preceding the filing of the petition, [Father] offered support within his limited means and has not shown an intent to lose his place in [Child's] life[?]

Father's Brief at 6.

Our review in termination cases is well-settled:

Appellate review in cases involving involuntary termination of parental rights is limited to determining whether the trial court's determination is supported by competent evidence.  When applying this standard of review, an appellate court must accept the findings of fact and credibility determinations of the trial court if they are supported by evidence of record.  Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.  An abuse of discretion is found where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will.  It matters not that an appellate court might have reached a different conclusion, as it is well-established that absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand.

*In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021) (citations and

internal quotation marks omitted).  The Supreme Court has emphasized that

---

[2] Father properly filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal with his notice of appeal.  *See* Pa.R.A.P. 1925(a)(2)(i) (requiring a concise statement be filed with notice of appeal in children's fast track appeals).

"in termination cases involving close calls, deference to the trial court's determination is particularly crucial." *Id.* at 597. Further,

> even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012) (citation omitted).

The Pennsylvania Supreme Court has explicitly acknowledged the "significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). Thus, with this in mind,

> the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of the statutory grounds for doing so. [C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. Because of this serious impact attending the termination of parental rights, it is important that a judicial decree extinguishing such rights be based solely on competent evidence.

*Id.* (citations and internal quotation marks omitted).

Section 2511 of the Adoption Code[3] sets forth the proper grounds for the involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511(a)(1)-

---

[3] 23 Pa.C.S. §§ 2101-2938.

(11). Here, the orphans' court found there was clear and convincing evidence to terminate Father's parental rights under subsection (a)(1):

> The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1). In determining whether grounds for termination exist under subsection 2511(a)(1), we must bear in mind:

> Although the six month period immediately preceding the filing of the petition is most critical to the analysis, the court must consider the whole history of the case and not mechanically apply the six-month statutory provision. The trial court must examine the individual circumstances of each case and consider all of the explanations of the parent to decide if the evidence, under the totality of the circumstances, requires involuntary termination.

*In re S.S.W.*, 125 A.3d 413, 416 (Pa. Super. 2015) (citation omitted).

With regard to the determination of whether a parent has failed to perform parental duties, the Supreme Court has explained:

> "Parental duties" are not defined in the Adoption Act, but our courts long have interpreted parental duties "in relation to the needs of a child[,]" such as "love, protection, guidance and support." **Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association.** The performance of parental duties "requires that a parent exert himself to take and maintain a place of importance in the child's life." Fortitude is required, as a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities. . . .

*L.A.K.*, 265 A.3d at 592 (emphases added). "This affirmative duty encompasses more than a financial obligation; it requires continuing interest

- 7 -

in the child and a genuine effort to maintain communication and association with the child." *In re Adoption of N.N.H.*, 197 A.3d 777, 784 (Pa. Super. 2018) (citation omitted). Further, a court may not predicate "a finding of abandonment . . . upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control[; rather, i]t may only result when a parent has failed to utilize all available resources to preserve the parental relationship." *L.A.K.*, 265 A.3d at 592 (citation omitted).

If the evidence establishes that a parent failed to perform parental duties or demonstrated a settled purpose to relinquishing parental rights under subsection 2511(a)(1),

> the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re J.R.E.*, 218 A.3d 920, 925 (Pa. Super. 2019) (citation omitted). Pursuant to Section 2511(b), the trial court must

> give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), . . . the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

The subsection 2511(b) analysis — which is required only if the court determines there are grounds for termination under subsection 2511(a) — includes consideration of "the emotional bond, if any, between parent and child[.]" *In re G.M.S.*, 193 A.3d 395, 401 (Pa. Super. 2018) (citation omitted). Moreover:

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability[.] Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*Id.* (citation omitted).

With this background in mind, we turn to Father's argument on appeal. Father contends the orphans' court erred in involuntarily terminating his parental rights to Child when he "offered support within his limited means and has not shown an intent to lose his place in [Child's] life." Father's Brief at 12. He maintains he has "made reasonable efforts to overcome obstacles" to preserve their relationship, and that Mother's evidence consisted of a "mere showing that he could have or should have done more." *Id.* at 13. However, Father insists that "is not enough to terminate [his] parental rights." *Id.*

Father emphasizes that he has "limited means" — he does not work, he receives Social Security, and he has struggled "to find a long-term residence." *Id.* at 12-13. He acknowledges that he stopped sending Mother money for Child when "he believed [Child] was being kept from him," but that he resumed doing so within the requisite six-month period prior to the filing of

the petition. *Id.* at 13. Father contends that the testimony at the termination hearing established that although he believed Child should "remain in Mother's care, [he] never had the purpose or intent to sever his ties" with Child, and that his "decision not to ask [Child] to call him 'Dad'" did not evidence his disinterest in their relationship. *Id.* at 14. Indeed, he insists that his "initial receptiveness" to Mother's discussions regarding termination and custody "was because he did not think that he would be losing his parental rights." *Id.* Thus, Father requests that we vacate the trial court's order and remand for further proceedings.

Upon our review of the record, the parties' briefs, and the relevant statutory and case law, we detect no error or abuse of discretion in the orphans' court ruling. In concluding termination of Father's parental rights was warranted under Subsection 2511(a)(1), the orphans' court opined:

> Father has evidenced both a settled purpose of relinquishing parental claim to [ ] Child and has failed to perform his parental duties in excess of six (6) months. Father's last in-person contact with [ ] Child was approximately 10 months ago, and that contact was neither requested nor arranged by Father.
>
> A parent has an affirmative duty [to] maintain a place of importance in a child's life and Father has clearly not met this affirmative duty. Although Father stayed home with [ ] Child when Mother returned to work after his birth, Father has shown — at most — a passive interest in [ ] Child for most of the Child's life. This Court is cognizant of the fact that Father has limited financial means, and transportation is an issue for him. However, Father saw [ ] Child only two times in 2020, and neither visit was initiated by him. Father's one and only overnight with [ ] Child occurred in 2019. Despite testifying that he made attempts to see [ ] Child and was denied by Mother, Father never filed a Complaint for Custody to establish or enforce his custodial rights. Father was

- 10 -

content to depend on Mother and/or his cousin to make arrangements for him to see [ ] Child. Other than an occasional monetary contribution, Father has failed to perform any basic parental duties for [ ] Child such as feeding, bathing, and providing a safe and secure residence since the parties separated. During this time, Father was content to have someone else be responsible for attending the child's medical appointments, tucking him into bed each night, and comforting him when he was scared or hurt.

Orphans' Ct. Op. at 6-7. The court also noted that while it did not "condone Mother's actions" in responding to Father's text message inquiries about Child that Father had the wrong number, it emphasized that this incident occurred in August of 2021 — "well after the filing of the Petition for Involuntary Termination of Parental Rights and at a time when Mother has sole legal and sole physical custody of the Child[.]" *Id.* at 7.

We conclude the record supports the orphans' court's findings. Mother testified that Father's involvement with Child from July until December of 2019 was "[v]ery hit or miss." N.T., 10/5/21, at 7. She stated that he asked to "come see" Child "once or twice" in 2020. *Id.* at 8. Mother testified Father visited with Child "a little after Easter" that year, but had "[v]ery minimal" interaction with Child at that time, and then saw him again in November of 2020 when Mother visited Father's cousin, and Father was present. *Id.* at 9-10. She emphasized that Father "had not asked" for that visit, and "was more interested with what was going on with his phone" than playing with Child. *Id.* at 9.

Father's testimony confirmed that he has not seen Child since November of 2020 — six months prior to Mother's filing to the termination petition — and

that his cousin had arranged that visit.  N.T. Termination H'rg, 10/5/21, at 40.

He claimed he asked to see Child "a couple of times" in 2020, but that Mother

"said [Child] was busy doing something."  *Id.* at 37.  When asked if he was

"trying to see" Child between November of 2020 and May of 2021, Father

replied, "I asked about him."  *Id.* at 41.  He did not provide any further

specifics.  *See In re Adoption of C.J.A.*, 204 A.3d 496, 503-04 (Pa. Super.

2019) ("A parent does not perform parental duties by displaying a merely

passive interest in the development of his or her child.") (citation omitted).

Thus, we are compelled to conclude the record supports the trial court's

findings that Father "evidenced both a settled purpose of relinquishing

parental claim to [ ] Child and has failed to perform his parental duties in

excess of six (6) months."  *See* Orphans' Ct. Op. at 6.  Father's only effort to

maintain his relationship with Child since November of 2020 was to send three

payments of $150, and "ask[ ] about" Child.  *See* N.T., Termination H'rg, at

41.  We reiterate that his affirmative duty to maintain his relationship with

child "encompasses more than a financial obligation[.]"  *N.N.H.*, 197 A.3d at

784 (citation omitted).  Recognizing Father's limited finances and

transportation difficulties, we point out that Father had a cell phone, but there

was no testimony he attempted to call or video chat with Child during the

relevant 6-month period, or, for that matter, at any time during the prior year.

Simply put, the record supports the trial court's determination that Father

failed to demonstrate a "continuing interest in [C]hild and a genuine effort to

maintain communication and association with" him, and that Father "failed to

utilize all available resources to preserve the parental relationship." *Id.* (citation omitted); *L.A.K.*, 256 A.3d at 592 (citation omitted). Thus, Father's challenge to the involuntary termination of his parental rights under subsection 2511(a)(1) fails.[4]

Once a trial court determines that termination is warranted under subsection 2511(a), it must then proceed to consider the needs and welfare of the child under subsection (b). *In re D.W.*, 856 A.2d 1231, 1234 (Pa. Super. 2004). Although the orphans' court properly did so in the present case,

_____

[4] Although we conclude the trial court's decision is supported by the record, we acknowledge the comments of Child's attorney — Jennifer Ayers, Esquire — at the conclusion of the termination hearing. When the court asked her position on the termination proceedings, Attorney Ayers responded:

> [M]y concern is it's obvious that [Child] has three people who love him very much sitting in this room. . . . [Father] is on SSI. He has demonstrated complete . . . difficulties for him personally to make [visits] happen with his son, but I don't think he's demonstrated a settle[d] pattern of not pursing or trying to pursue his parental rights. . . . I think that he has done the best that he can in this situation that he finds himself in.
>
> I am troubled and concerned that Mom is purposefully trying to dissuade him from contacting her by telling him that he no longer has the correct number after these proceedings have been filed.
>
> So . . . I am of the opinion that this may be best suited for custody court and not termination at this point.

N.T., Termination H'rg, at 55. Nonetheless, the orphans' court specifically considered Attorney Ayers' argument in its opinion, before noting that "a parent's love for the child is not the statutory standard . . . when determining whether to terminate that parent's right." Orphans' Ct. Op. at 8. We are constrained to agree.

Father did not challenge the court's subsection 2511(b) determination in either his Pa.R.A.P. 1925 concise statement[5] or his brief. For that reason, this issue is waived.[6] *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (waiving Mother's argument regarding Section 2511(b) when she failed to include it in her statement of questions involved or concise statement).

Thus, because we conclude the orphans' court's findings are supported by the record, we affirm the decree involuntarily terminating Father's parental rights.

_____

[5] Father's Rule 1925(b) statement raised the following two claims:

1. The Court's ruling was against the weight of the evidence because insufficient evidence was presented to establish that [Father] demonstrated a settled purpose to relinquish his parental claim over the prior six months.

2. The Court's ruling was against the weight of the evidence because insufficient evidence was presented to establish that [Father] refused to perform parental duties over the prior six months.

Father's Concise Statement of Matters Complained of on Appeal Pursuant to Rule 1925(b), 11/10/21.

[6] Nevertheless, we note that even if we were to review the orphans' court's subsection 2511(b) analysis, Father would be entitled to no relief. *See* Orphans' Ct. Op. at 9 (finding Father has no bond with less than four-year-old Child he has seen "only a handful of times since Mother and Father separated approximately two years ago[;]" Child has not asked about Father since his last visit in November of 2020; Child calls Husband "Daddy[;]" Husband, "who has been in Child's life since he was 1.5 years old, . . . is the only father-figure the Child knows.").

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/10/2022