J-A22041-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.L.W., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: P.G., MOTHER | : | No. 517 WDA 2023 |

Appeal from the Order Entered April 18, 2023
In the Court of Common Pleas of Lawrence County
Orphans' Court at No(s):  20034 of 2022

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: JANUARY 4, 2024**

Appellant, P.G. ("Mother") appeals from the order entered in the Lawrence Count Court of Common Pleas, Orphans' Court Division, which denied Mother's petition for involuntary termination of the parental rights of Appellee, S.W. ("Father").  We affirm.

The relevant facts and procedural history of this appeal are as follows. The parties never married, and they are the parents of A.L.W. ("Child"), who was born in December 2011.  When Child was five years old, the parties separated.[1]  Following the separation, Mother served as Child's primary caretaker.  By agreement of the parties, Father took Child for overnight visits on weekends.  This arrangement lasted until 2018, when Father's visits

_____

[1] During the first five years of Child's life, Mother characterized Father as "a good father," who "was there for [Child]."  (N.T. Hearing, 12/14/22, at 68).

ceased.[2]

In 2020, Father filed a custody action against Mother. The court entered an interim custody order on September 25, 2020, granting shared legal custody, with primary physical custody to Mother. The order also called for the parties to participate in reunification counseling with a review scheduled for November 2020. (*See* Findings of Fact and Conclusions of Law, filed 4/18/23, at ¶10). The parties commenced counseling with a therapist, Elo Pranno. Ms. Pranno conducted an intake appointment with Child on October 10, 2020. Initially, Ms. Pranno conducted individual counseling sessions with Child and Father. In January 2021, Father and Child began joint "visitation" sessions with Ms. Pranno. (N.T. Hearing, 12/14/22, at 10). Mother also allowed Child to have unsupervised visits with Father at his residence.

Nevertheless, the unsupervised visits ended after an incident on March 31, 2021. At that time, Child returned to Mother's residence after an unsupervised visit with Father. Child was carrying "a little mini book bag that she would take to her dad's[.]" (*Id.* at 85). As Mother helped Child to unpack

---

[2] The parties both testified about an incident in the summer of 2018 that precipitated the end of Father's visits with Child. Mother testified that Child came home from a visit and told Mother that she "found a gun under [Father's] couch and pulled it out and gave it to him." (N.T. Hearing, 12/14/22, at 75). Mother testified that she confronted Father about Child's claim, and "he didn't really admit to it, he just kind of said it wasn't his." (*Id.*) After the incident, Father continued to request to see Child. Mother "didn't say anything" when Father would reach out, and Father "slowly stopped reaching out unless it was a holiday or [Child's] birthday." (*Id.* at 76).

the bag, Mother claimed to have "found a marijuana roach" in the bag. (N.T. Hearing, 2/14/23, at 12). Mother contacted the state police to file a report about the incident. Mother also contacted Father to inform him that she would no longer allow unsupervised visits, and Father could exclusively see Child during their visitation sessions with Ms. Pranno. Father, however, did not resume his participation in the sessions with Ms. Pranno. Father emphasized that he received a letter from Ms. Pranno discharging him as a patient due to an unpaid invoice. Thus, Father assumed that he could no longer attend the sessions.[3] (*See* N.T. Hearing, 2/14/23, at 14).

On May 20, 2021, the court issued another order in the custody action directing Father to attend anger management classes and resume reunification counseling. Father claimed that he and his attorney, Anastasa Williams, reached out to Ms. Pranno to comply with the order, but there was "no call back." (*Id.*) Thereafter:

> On July 15, 2021, a Final Custody Order was signed following a Conciliation Conference with the Conference Hearing Officer. The Order stated that Father had not gone to anger management and that Father was not attending reunification counseling. The Order also stated that the September 25, 2021 and May 2[0], 2021 Orders of Court remained in effect. These Orders gave Father the right to

---

[3] Ms. Pranno confirmed that she sent a discharge letter to Father in March 2021 "for nonpayment of services." (N.T. Hearing, 12/14/22, at 19). Due to Father's nonpayment, Ms. Pranno never again reached out to Father about the resumption of reunification counseling. (*See id.* at 52). Ms. Pranno testified that Father could resume counseling only "if he's willing to cover the previous costs that he still is delinquent on." (*Id.* at 56).

> communicate with his daughter by telephone, Facetime, and text.[4]
>
> Father filed exceptions to the Conciliation Conference Order and a hearing was scheduled for September 21, 2021. The September 21, 2021 hearing was continued to October 13, 2021. Father's Petition for Exceptions to the Conciliation Hearing Officer's Order was denied.

(Findings of Fact and Conclusions of Law, filed 4/18/23, at ¶¶22-23).

In light of the July 2021 order reiterating Father's need for counseling, Father again directed his attorney to contact Ms. Pranno. Nevertheless, Father never made another appointment for counseling. During the summer of 2021, Father also stopped communicating with Mother. Father explained, "It's always she never responds, it's going to be oh, I'll see you in court or talk to the lawyer." (N.T. Hearing, 2/14/23, at 22). Thus, Father has not seen Child since "[t]wo weeks before Easter 2021." (*Id.* at 25).

Against this backdrop, Mother filed a petition for the involuntary termination of Father's parental rights. The petition confirmed that "an adoption is presently contemplated, and a person with a present intention to

---

[4] Regarding Father's electronic communications with Child, Father testified that he began to Facetime and text with Child in November 2020. (*See* N.T. Hearing, 2/14/23, at 15-16). Father would Facetime with Child "once a week or once every other week," and he would text Child a "[c]ouple times a week." (*Id.* at 16). After March 2021, however, Mother "blocked" Father on Child's phone. (*Id.*) Mother explained that she took this action because Father "was not doing what he was supposed to do in the court order to see [Child]," and Father's communications "upset" Child. (N.T. Hearing, 12/14/22, at 97).

adopt exists." (Termination Petition, filed 8/25/22, at ¶9).[5] Upon receiving Mother's petition, the court appointed Attorney Litzenberg to represent Child in the proceedings. The court also scheduled the termination hearing for October 2022. Prior to the hearing, Father filed a motion for continuance. In it, Father indicated that Attorney Williams had recently left her firm. New counsel from the same firm, Attorney Olson, wanted more time to prepare for the termination hearing. By order dated October 7, 2022, the court granted the continuance and scheduled the termination hearing for December 14, 2022.

The court conducted a termination hearing on December 14, 2022. The parties did not complete their testimony at that time, and the court scheduled the hearing to resume on February 14, 2023. Prior to the resumption of the hearing, Mother filed a motion for appointment of a guardian *ad litem* ("GAL"). The court denied Mother's motion on January 26, 2023. On February 14, 2023, the parties concluded the termination hearing. Thereafter, the court conducted an *in camera* interview with Child on April 10, 2023. On April 18, 2023, the court issued findings of fact and conclusions of law, and it denied Mother's petition for involuntary termination of Father's parental rights. Mother timely filed a notice of appeal and concise statement of errors

---

[5] At the termination hearing, the court received testimony from Mother's husband, J.D., who indicated that he would immediately adopt Child if the court terminated Father's parental rights. (**See** N.T. Hearing, 12/14/22, at 129-30).

complained of on appeal on May 4, 2023.

On June 8, 2023, Father's counsel filed a motion to withdraw in this Court. In it, Attorney Olson indicated that Father "has not retained [counsel] to represent his interests in this appeal action." (Motion to Withdraw, filed 6/8/23, at ¶3). Further, Attorney Olson stated that he "notified [Father] on numerous occasions that his services would need to be retained or counsel would withdraw, to which [counsel] received no return communications." (***Id.*** at ¶4). By order entered June 28, 2023, this Court: 1) granted counsel's motion; 2) directed the Orphans' Court to determine whether Father was entitled to appointed counsel within ten days; and 3) instructed Father to notify this Court whether he intended to retain private counsel or proceed *pro se*. In response to our order, the Orphans' Court provided Father with a petition to proceed *in forma pauperis*, and it ordered him to complete the petition no later than July 13, 2023. Father, however, did not file a completed petition with the Orphans' Court. Father has not filed a brief on appeal, and new counsel has not entered an appearance on his behalf.

Mother raises the following issues for our review:

> Whether the trial court committed an abuse of discretion or error of law in denying Mother's petition to involuntarily terminate the parental rights of Father.
>
> Whether the trial court committed an abuse of discretion in failing to consider uncontradicted expert testimony.
>
> Whether the trial court committed an abuse of discretion as to the role of attorney for child and failure to appoint a [GAL].

- 6 -

(Mother's Brief at 4).

Appellate review in termination of parental rights cases implicates the following principles:

A parent's right to make decisions concerning the care, custody, and control of his or her children is among the oldest of fundamental rights. The time-tested law of the Commonwealth requires that we balance this intrinsic parental interest within the context of a child's essential needs for a parent's care, protection, and support. We readily comprehend the significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child. For these reasons, the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of the statutory grounds for doing so. [C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. Because of this serious impact attending the termination of parental rights, it is important that a judicial decree extinguishing such rights be based solely on competent evidence.

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law,

or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, [w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, ___ Pa. ___, ___, 255 A.3d 343, 358-59 (2021)

(internal citations and quotation marks omitted).

Mother filed a petition for the involuntary termination of Father's parental rights on the following grounds:

### § 2511. Grounds for involuntary termination

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as

- 8 -

inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1)-(2), (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010).

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

In her first issue, Mother asserts that Father's conduct following his initiation of the custody action demonstrated an outright refusal to parent Child, which warranted the termination of his parental rights in the instant case. Mother emphasizes that the orders issued in the custody case provided Father with clear directives if he wished to visit with Child. Specifically, the orders required Father to participate in anger management and reunification counseling for visits to recommence. Because Father did not take steps to comply with these orders, Mother insists that the court improperly blamed her

for thwarting Father's attempts to have a relationship with Child.

Further, Mother argues that several of the court's findings of fact are unsupported by the record, and "subject to close scrutiny" by this Court. (Mother's Brief at 14). Mother complains that the court blamed her for cutting off all visitation between Father and Child following the March 31, 2021 incident where Mother discovered a marijuana "roach" in Child's bag. Mother maintains that she played no part in cutting off visitation; rather, she simply required Father to have any future visits under the supervision of the family therapist. Mother takes issue with the court's finding that she blocked Father's calls and texts on Child's cell phone. Mother avers:

> The trial court presents this as a barrier to Father and castigated Mother. The proper inquiry of the trial court, per case law, is whether Father did anything to overcome the barrier. There was no barrier: Father needed only to return to reunification counseling.

(*Id.* at 16). Mother also disputes the court's findings regarding: 1) Father's ability to communicate with counsel after Attorney Williams left the firm; 2) whether Father sent cards and gifts to Child; and 3) whether Mother's intentional actions resulted in Father's lack of contact with Child.

Based upon the evidence of record, Mother contends that Father "chose not to call the therapist and left Child to languish without a paternal figure." (*Id.* at 26). In Father's absence, Child's stepfather "became the father figure." (*Id.*) Thus, Mother concludes that she presented clear and convincing evidence warranting the termination of Father's parental rights, and this Court

must reverse the order denying her petition. We disagree.

"A court may terminate parental rights under subsection 2511(a)(1) when the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the filing of the termination petition." *In re I.J.*, 972 A.2d 5, 10 (Pa.Super. 2009).

> Though we do not adhere to any strict definition of parental duty, a child has a right to essential parental care, and our jurisprudence reveals certain irreducible qualities of a parent's attendant obligation. Foremost, it is a positive duty requiring affirmative performance. [C]ommunication and association are essential to the performance of parental duty[.] [P]arental duty requires that a parent exert himself to take and maintain a place of importance in the child's life. A parent must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship, or his rights may be forfeited. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Adoption of C.M., supra* at ___, 255 A.3d at 364 (internal citations and quotation marks omitted).

Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa.

- 11 -

718, 872 A.2d 1200 (2005) (internal citations omitted).

"The bases for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.B.*, 990 A.2d 762, 771 (Pa.Super. 2010). Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

Instantly, the Orphans' Court evaluated the testimony from the termination hearings and determined that Mother failed to establish grounds for termination under Section 2511(a)(1) or (2). The thrust of the court's reasoning appears in the following conclusions of law:

> The child was benefitting from the re-established relationship between herself and her Father. The Mother stopped the [unsupervised] visits and communications between the Father and child despite the fact the child was happy and enjoying the visits and communications with her Father…. The Mother's interference with the relationship between the Father and the child has been detrimental to the child and continues to do harm to this child. The child is now angry with the Father for stopping communications with her and is completely unaware of her Mother's role in stopping those contacts and communications. The [c]ourt is not at all convinced that a portion of a marijuana roach

- 12 -

was in the child's backpack after the child left the Father's home.

The child is angry with the Father for stopping communications with her and needs to be told that the Father was blocked from communicating with her. Neither the Mother nor Elo Pranno has ever explained that to the child. Reunification needs to begin again with a counselor other than Elo Pranno. Any trust between the Father and Elo Pranno as to her neutrality in reunifying the family no longer exists and the allowing of the child to believe that the Father cut off contact with the child makes re-establishment of trust between the Father and Elo Pranno no longer possible.

(Findings of Fact and Conclusions of Law at ¶¶33-34).

Our review of the record supports these conclusions. In March 2021, Mother ceased all unsupervised visits between Father and Child due to Mother's allegations concerning the marijuana roach. (*See* N.T. Hearing, 12/14/22, at 87). Although Mother's unilateral decision did not foreclose the possibility of supervised visitation, it complicated matters where Father believed that he had been discharged as a patient from Ms. Pranno's practice. (*See* N.T. Hearing, 2/14/23, at 14). Moreover, even Mother conceded that "things were going well" prior to her allegations concerning the marijuana roach.[6] (N.T. Hearing, 12/14/22, at 87).

Regarding the disruption in Father's communications with Child, Mother confirmed that she blocked Father on Child's cell phone. (*See* N.T. Hearing,

---

[6] During her *in camera* interview, Child testified that she had fun during the unsupervised visits. (*See* N.T. Hearing, 4/10/23, at 13).

12/14/22, at 97).  The impact of this action came to light during Child's testimony:

> [Father's Counsel]:  And do you think if you went back there [to Father's house], you would still have fun?
>
> [Child]:              Uh-uh.
>
> [Father's Counsel]:  Why?
>
> [Child]:              I don't know, I just don't really know him.
>
> [Father's Counsel]:  Okay.  And have you ever discussed why you weren't contacting him with anybody in your house, like your mom or your stepdad?
>
> [Child]:              Uh-uh.
>
> [Father's Counsel]:  You never talked to them about it?
>
> [Child]:              Uh-uh.

(N.T. Hearing, 4/10/23, at 13).  The court later asked Child, "Do you know if your dad's number was blocked so he couldn't text you?"  (*Id.* at 20).  Child responded, "No, I don't think it was."  (*Id.*)  Child also said that she did not think that Mother would block Father on her phone, and Child would have responded to text messages if Father had sent them.  (*See id.* at 21).

As far as Father's relationship with Ms. Pranno, Father described one incident that caused him to question Ms. Pranno's neutrality:

> There was one time we was in a meeting and we got into like a little argument and [Mother] and Elo was just like, I feel like they were attacking me and Elo stood up and was—said like, oh, I will never let that happen to another mother and all kind of stuff.

- 14 -

(N.T. Hearing, 2/14/23, at 11). Later, Father summarized his feelings on Ms. Pranno as follows: "I just feel like she's on [Mother's] side, like … it's a conflict of interest." (*Id.* at 25-26).

Based upon this testimony, the Orphans' Court did not find that Father exhibited a settled purpose to relinquish his parental rights or refused to perform parental duties. (*See* Findings of Fact and Conclusions of Law at ¶35). Rather, the court placed greater weight upon evidence showing that Mother's actions compromised Father's place in Child's life. Although Mother characterizes the court's decision as "an unsupported and unwarranted diatribe against Mother" (*see* Mother's Brief at 14), our review compels us to conclude that competent evidence supported the order denying Mother's termination petition. ***See Adoption of C.M., supra***. Moreover, this is a case where several witnesses provided copious amounts of testimony over the course of multiple, contentious termination hearings. We recognize that the Orphans' Court made first-hand observations of the parties spanning the course of these hearings, and we grant appropriate deference to the conclusions based upon those observations. ***Id.*** Accordingly, Mother is not entitled to relief on her first claim.

In her second issue, Mother contends that the court accepted Ms. Pranno as an expert in clinical social work, but the court "entirely ignored" the substance of Ms. Pranno's testimony about Child's best interests. Mother highlights Ms. Pranno's conclusions that Father was not vested in the

reunification process, and Father's inconsistent role in Child's life was detrimental to Child's welfare. "While a … court is not required to accept an expert's conclusion, it is an abuse of discretion for a court to totally discount uncontradicted expert testimony as unpersuasive." (Mother's Brief at 32) (citing ***M.A.T. v. G.S.T.***, 989 A.2d 11, 19-20 (Pa.Super. 2010)). Mother concludes that the court abused its discretion by failing to consider Ms. Pranno's uncontradicted testimony. We disagree.

In cases involving our review of termination of parental rights proceedings, we reiterate that "[w]e are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence." ***In re M.G.***, 855 A.2d 68, 73 (Pa.Super. 2004) (quoting ***In re Diaz***, 669 A.2d 372, 375 (Pa.Super. 1995)). The Orphans' Court is free to believe all, part, or none of the evidence presented, and it is free to make all credibility determinations and resolve conflicts in the evidence. ***See id.*** at 73-74.

Instantly, Mother is correct in her assertion that Ms. Pranno provided comprehensive testimony regarding the impact of Father's absence from Child's life. Ms. Pranno confirmed that she saw Child in individual counseling sessions before facilitating visitation between Child and Father. (***See*** N.T. Hearing, 12/14/22, at 10). During the individual sessions, Child "exhibited symptoms of anxiety," as well as "behavioral concerns in terms of meltdowns and just externalizing the behaviors." (***Id.*** at 11-12). Ms. Pranno was

concerned that these symptoms would increase as Father was reintroduced into Child's life. Despite Ms. Pranno's concerns, Father pushed for reunification at a faster pace. Ms. Pranno explained that Father "would comment that the child would just need to overlook the anxiety and—and just move forward and do it, meaning with the visits." (*Id.* at 13). Once visits commenced, Father also expressed a desire for Child to "be exposed to [Father's] whole family." (*Id.* at 15). Ms. Pranno, however, did not believe that "it was healthy to expose [Child] to all of the family members at once." (*Id.*)

Ms. Pranno testified that the supervised visitation sessions ended in spring of 2021, after Mother's discovery of the marijuana roach in Child's bag. At that time, Ms. Pranno described the situation as follows:

> It appeared that things with visitations and the counseling had gone relatively well, and at that point, my concern had been how—how the adult behaviors were more lax and not, you know, focused in on the well-being of the child.

(*Id.* at 18). Following the marijuana roach incident, Ms. Pranno sent the discharge letter to Father due to nonpayment for services rendered. (*Id.* at 19). Thereafter, Father did not contact Ms. Pranno for further counseling.

In discussing the advancement of Father's relationship with Child, Ms. Pranno opined that reunification counseling and visitation were "the key in moving forward." (*Id.* at 21). Nevertheless, Ms. Pranno acknowledged the recent "absence of contact" between Child and Father, noting its potential for an adverse effect on Child:

> So the idea that the father has exited the child's life again has a direct impact on the child's self-esteem. We're talking about again the possibility of new symptoms of depression. I have more recently spoken with [Child] in a different context, against seeing the symptoms of anxiety, the anger that has now also surfaced directed at her father.[7]

(*Id.* at 22-23). Finally, Ms. Pranno provided the following assessment of Child's best interests:

> So considering the length of time that the biological father had been given a chance to participate and to be part of the counseling and the visitation process and then how [Father] sort of put himself in the center of—of, you know, his needs and not considering the child's needs, I don't think it is healthy to continue on this path in this direction.

(*Id.* at 25). Ms. Pranno then clarified that "on this path" meant "trying more visitation." (*Id.* at 26).

Contrary to Mother's arguments, the court did not ignore Ms. Pranno's testimony. The court acknowledged that Child suffered from anxiety during her initial visits with Ms. Pranno. (*See* Findings of Fact and Conclusions of Law at ¶13). The court admitted that Father violated the custody orders by failing to pay for the counseling sessions or resume counseling. (*Id.* at ¶31). The court also recognized that Child is now angry over the recent absence of Father from her life. (*Id.* at ¶¶33-34). Rather than relying on Ms. Pranno's testimony alone, however, the court balanced Ms. Pranno's conclusions against the rest of the evidentiary record.

---

[7] Ms. Pranno explained that she continued individual counseling sessions with Child after she discharged Father as a patient.

- 18 -

Significantly, the court found that Mother's act of blocking Father on Child's cell phone contributed to Father's inability to communicate with Child and worked to Child's detriment. (**Id.** at ¶33). Ms. Pranno was aware of the blocking, but she did not inform Child about the situation. Instead, "[i]t was explained to the child that mom's phone was to be used to communicate with dad." (N.T. Hearing, 12/14/22, at 55-56). Based upon the foregoing, we cannot say that the Orphans' Court exhibited a capricious disregard for the competent and credible evidence offered by Ms. Pranno. **See In re M.G., supra**. Therefore, Mother is not entitled to relief on her second claim.[8]

In her third issue, Mother contends that the Orphans' Court appointed Attorney Litzenberg to represent Child, pursuant to 23 Pa.C.S.A. § 2313(a). Nevertheless, Mother explains that Attorney Litzenberg's role as counsel "is distinct from the role of the [GAL]," and the court erred by denying her unopposed motion for appointment of a GAL. (Mother's Brief at 33). Mother also claims that Attorney Litzenberg did not fulfill her duty to advocate on behalf of Child's legal interests. Mother emphasizes that Attorney Litzenberg

_____

[8] To the extent Mother relies on **M.A.T.**, we consider **M.A.T.** to be distinguishable from the instant case. **See M.A.T., supra** at 18-20 (holding court abused its discretion in rejecting recommendations of jointly retained custody evaluator and basing its decision to award primary physical custody to ex-husband due to court's personal opinion that shared custody was seldom in best interests of school-age children; while court was not required to adopt evaluator's recommendations, it was also not entitled to disregard them and rely on personal views of child's best interests not supported by evidence of record).

met with Child on one occasion only, and Attorney Litzenberg did nothing more than provide a cursory argument to the court at the conclusion of the termination hearings. Mother concludes that the court abused its discretion by failing to appoint a GAL and failing to provide Child with a zealous advocate. We disagree.

"In cases involving children, the law acknowledges two separate and distinct categories of interest: a child's legal interests, which are synonymous with the child's preferred outcome, and a child's best interests, which the trial court must determine." *In re Adoption of L.B.M.*, 639 Pa. 428, 432, 161 A.3d 172, 174 (2017) (internal footnotes omitted). "'Best interests' denotes that a guardian *ad litem* is to express what the guardian *ad litem* believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees." *In re T.S.*, 648 Pa. 236, 240 n.2, 192 A.3d 1080, 1082 n.2 (2018).

"Section 2313(a) [of the Domestic Relations Code] requires counsel to advocate on behalf of the children's legal interests" in termination of parental rights and adoption cases. *Adoption of L.B.M., supra* at 444, 161 A.3d at 182. Specifically, the statute provides as follows:

> The court **shall** appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court **may** appoint counsel or a guardian *ad litem* to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm

shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a) (emphasis added). "Concerning the responsibilities of counsel when representing a child, this Court has stated that effective representation requires, at a bare minimum, attempting to ascertain the client's position and advocating in a manner designed to effectuate that position." *In re Adoption of C.J.A.*, 204 A.3d 496, 501 (Pa.Super. 2019) (internal citation and quotation marks omitted).

Instantly, Child testified at the *in camera* hearing, and she fully informed the court about her hope to be adopted by her stepfather. (*See* N.T. Hearing, 4/10/23, at 10-11, 15-16). Thereafter, Attorney Litzenberg made the following argument on Child's behalf:

> Okay. Your Honor, the [c]ourt has heard the child's statements. She does wish to be adopted by her stepfather. It's clear that she is in a loving, stable home in her mother's care, but the [c]ourt has also heard [Child's] statements regarding her relationship with her father, and I would direct that the [c]ourt review the child's testimony for any clarification on her position in this matter.

(*Id.* at 35-36).

While Mother claims that Attorney Litzenberg's actions fell below the "bare minimum" of what is required from a child's counsel, we disagree with this assessment. The record demonstrates that Attorney Litzenberg ascertained Child's position and advocated in a manner designed to effectuate that position. *See Adoption of C.J.A., supra*. We do not fault Attorney Litzenberg for the fact that Child's own testimony did the "heavy lifting" in

terms of conveying Child's preference to the court. Moreover, Mother's cursory argument leaves us unconvinced that the court erred in denying the motion for appointment of a GAL, particularly where such an appointment was left to the court's discretion.[9] **See** 23 Pa.C.S.A. § 2313(a). Thus, Mother is not entitled to relief on her third issue, and we affirm the order denying the petition for involuntary termination of Father's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

FILED: 1/4/2024

---

[9] Furthermore, because the court found that Mother did not satisfy her burden under Section 2511(a), the court did not engage in a "best interests" analysis pursuant to Section 2511(b). **See In re L.M., supra**. Accordingly, the court did not need to hear from a guardian *ad litem* regarding what would be best for Child's care, protection, safety, and wholesome physical and mental development. **See In re T.S., supra**.